## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| ERMA ROBINSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:14-CV-807-RLW |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Erma Robinson's ("Robinson") application for disability insurance benefits under Title II and Title XVI of the Social Security Act.

### I. Background

Robinson alleged that she had been disabled since March 9, 2010. (Tr. 35). The Social Security Administration ("SSA") denied Robinson's application for benefits and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Robinson's request and a hearing was held on February 11, 2013. The ALJ issued a written decision on March 15, 2013, upholding the denial of benefits. (Tr. 9-32). Robinson filed a timely Request for Review of Hearing Decision with the (Tr. 5). The Appeals Council denied Robinson's Request for Review. (Tr. 1-4). The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Robinson filed this appeal on April 25, 2014. (ECF No. 1). Robinson filed a Brief in Support of her Complaint on

July 31, 2014. (ECF No. 12). The Commissioner filed a Brief in Support of the Answer on November 3, 2014. (ECF No. 18). Robinson filed a reply brief on November 17, 2015. (ECF No. 19).

## II. Decision of the ALJ

The ALJ found that Robinson had the following severe impairments: diabetes mellitus, neuropathy, loss of toes, panic attacks, depression and obesity. (Tr. 15-16). The ALJ, however, determined that Robinson did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 16-18). The ALJ found that Robinson had the residual functional capacity (RFC) to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently. She is able to stand and/or walk for 6 hours of an 8-hour workday and sit for about 6-hours of an 8-hour workday. (Tr. 18). The ALJ found that Robinson could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl, and frequently reach, handle, and finger; should avoid exposure to hazards, such as dangerous machinery and unprotected heights; and can understand, remember, and carry out simple instructions in a routine work setting. (Tr. 18-24). The ALJ found that Robinson could not perform any past relevant work. (Tr. 24). The ALJ determined that, based on Robinson's RFC, jobs exist in significant numbers in the national economy Robinson could perform, including as an eyewear assembler, semiconductor bonder, and circuit board screener. (Tr. 25). Consequently, the ALJ found that Robinson was not disabled. (Tr. 25).

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

2

## A. Hearing Testimony

Robinson testified on February 11, 2013, as follows:

Robinson was born in 1965 and is forty-seven. (Tr. 38). Robinson lives in an apartment with her nephew, who is listed as her caregiver. (Tr. 37). The nephew doesn't live with her; he comes by frequently to help with grocery shopping and the like. (Tr. 38). She is in a low-income apartment and pays no rent. (Tr. 37). She receives public assistance from Medicaid and her sister helps her with utilities. (Tr. 37). She has no sources of income and is not currently working. (Tr. 37). She has one child below the age of 18 but he lives with his dad. (Tr. 37).

She has a ninth grade education and never completed her GED. (Tr. 38). She was trained as a certified nursing assistant (CNA), but has not kept that certification current since 2001. (Tr. 38-39).

Robinson stopped working on March 9, 2010 because of a medical condition. (Tr. 39). She was in the hospital for two weeks with pneumonia in both lungs. (Tr. 39). She was let go when, after returning to work, she continued to miss additional work due to her panic attacks and issues with neuropathy. (Tr. 39-40). During the last six months she was working at Sam's Club, she thinks she missed one day of work per week. (Tr. 40). She had pain in her legs while working as a cashier at Sam's dating back until 2007 but she would endure the pain to keep her job. (Tr. 41). Her shifts as a cashier at Sam's were anywhere from four to eight or more hours and she remained on her feet for the whole shift. (Tr. 41). Once or twice a month, the pain would be so intense that she would have to go home. (Tr. 42). More often, she had to leave early because she was having panic attacks. (Tr. 42). She doesn't know what brings on her panic attacks, except that she has PTSD. (Tr. 42-43). Her panic attacks start as chest pain, which moves down her arm and up her neck. (Tr. 43-44). She was fired because she missed too

3

much work but they offered to rehire her if she was able to hold down a job again, but that has not happened. (Tr. 44). She received unemployment from the State of Minnesota until November 2011. (Tr. 44-45). She tried to look for work as a condition of receiving unemployment but no one would hire her because of her limitations. (Tr. 45). Her limitations are her inability to stand for long periods of time, lost sensation in her hands, and inability to lift heavy weights. (Tr. 45). She applied for jobs she was trained for: server, cashier, as well as jobs in nursing homes as a CNA or as a nurse's aide. (Tr. 45-46). She hasn't applied for a job since November 2011. (Tr. 46). Robinson claims she stopped applying for jobs then because she started having some new attacks, particularly sharp drops in her blood pressure. (Tr. 47).

Robinson applied for disability benefits from Social Security in October 2010. (Tr. 48). Her application for disability benefits was denied in March 2011. (Tr. 48). In June 2011, Robinson filed another application with Social Security because things had gotten worse with her diabetes. (Tr. 48). She hasn't had any work since she left Sam's Club. (Tr. 48). Her neuropathy has gotten worse and she has more numbness in her feet. (Tr. 48-49).

She can only stand for an hour or two before she has to sit down for a half-an-hour and elevate her feet. (Tr. 49-50). If she sits for too long then her legs get tight and numb. (Tr. 50-51). She needs to get up and stretch her legs and body after sitting in an office chair for an hour. (Tr. 51).

Due to her medication, she has panic attacks less often than when she was working at Sam's Club. (Tr. 51). She only gets panic attacks every two weeks and the attacks last a half an hour to up to two hours. (Tr. 51-52). She last sought medical attention for a panic attack a few months ago. (Tr. 52). She usually goes to the emergency room or the clinic when she has an

4

attack. (Tr. 52). Her doctors told her she needs to find the right medication to control her panic attacks. (Tr. 52).

She has trouble lifting anything heavy because her shoulders "give out." (Tr. 53). She has lost sensation in the tips of her fingers. (Tr. 53). She can't thread a needle, move the mouse on a computer, sew a button, and open a lid with a can opener. (Tr. 53-54). She hasn't driven since she stopped working in 2010 because of her panic attacks and her neuropathy. (Tr. 54).

She wears bifocals. (Tr. 55). She has retinal disease and cataracts. (Tr. 55).

She takes Gabapentin for her diabetes and two pills for her neuropathy. (Tr. 55). She has no side effects from her medication. (Tr. 55).

Robinson has been on medication for depression since 2007. (Tr. 55-56). Her depression has gotten worse since she lost her job because she liked her job and coworkers. (Tr. 56). She will seclude herself and lie in bed because she doesn't want to be around people. (Tr. 56). Her medication helps her depression. (Tr. 56). She gets along with people for the most part. (Tr. 57). She leaves her house two to three times per week to go to the grocery store or a doctor's appointment. (Tr. 57). She uses the Medicaid transport van or her nephew drives her. (Tr. 57). She watches TV, uses the computer, and does word searches to pass the time. (Tr. 57).

Her nephew does the heavy lifting and Robinson's laundry. (Tr. 57). There is "very minimal" housework she can do. (Tr. 57). She prepares simple meals. (Tr. 58).

Vocational expert Bob Hammon testified on February 11, 2013, as follows:

Robinson's past work at Sam's Club was as a retail clerk, which is classified as an SVP: 2 at the light level. (Tr. 59). The ALJ asked Hammon to assume an individual 47 years of age, 9th grade education, same past work as the claimant, who can perform light work with the following specifications: be able to lift and/or carry 20 pounds occasionally, 10 pounds

5

frequently; stand and/or walk for six hours of an eight hour workday, sit for about six hours of an eight hour workday; occasionally be able to climb ramps and stairs but no ladders, ropes, or scaffolds; occasionally be able to balance, stoop, kneel crouch, and crawl; frequently reach, handle, and finger; avoid exposure to hazards such as dangerous machinery or unprotected heights; and be able to understand, remember, and carry out simple instructions in a routine work setting. (Tr. 60). Hammon states that the hypothetical individual would not be able to perform the job of a retail clerk. (Tr. 60). The ALJ asked Hammon to assume a new hypothetical individual with the following specifications: individual of 47 years of age; 9th grade education; no relevant past work; can lift and/or carry, push, pull 20 pounds occasionally and 10 pounds frequently; walk for a total of two hours throughout an eight-hour workday; be able to alternate between sitting and standing throughout the workday; limited to occasional ramps and stairs; no ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, crawling; frequent reaching and handling; frequent fingering; avoid hazards such as dangerous machinery or unprotected heights; be able to understand, remember, and carry out simple instructions in a routine work setting where interaction with supervisors, coworkers, and the public would be superficial in nature. (Tr. 61). Hammon surmises that the hypothetical person would be able to perform work as an eyewear assembler, semi-conductor bonder, and a circuit board screener, which are all sedentary positions. (Tr. 62). Finally, the ALJ asked Hammon to assume that the person in the second hypothetical would be absent from work all together or would have to leave before the end of the scheduled workday on average two to three times per month. (Tr. 62). Hammon believed that no job would be available for person with such restrictions. (Tr. 62).

6

## B. Medical Records

Robinson's relevant medical records are summarized as follows:

On July 1, 2010, Robinson was admitted to Phelps County Regional Medical Center for vulvar pain secondary to vulvar cellulitis. (Tr. 265-266). On July 10, 2010, an x-ray demonstrated slight worsening of her bilateral infiltrates. (Tr. 294). She was discharged on July 13, 2010, with a diagnosis of vulvar pain secondary to acute vulvar cellulitis and type 2 diabetes, uncontrolled. (Tr. 265-266).

Robinson was treated by urologist Dr. Kevin Zhang of the Fairview Fridley Clinic. (Tr. 299-303). Robinson had failed multiple trials of voiding and was unable to perform a self-catherization. (Tr. 301). On September 30, 2010, Dr. Zhang talked to Robinson about a suprapubic tube placement for permanent urinary drainage. (Tr. 299).

On September 30, 2010, Robinson was seen at Fairview Lakes Regional Medical Center for diabetes. (Tr. 461-64). She reported waking up in the morning with panic attacks. Robinson indicated that Neurontin was not working for her neuropathy. Robinson acknowledged that she had not been following her diet. (Tr. 461). She was diagnosed with uncontrolled diabetes, hypertension and hypercholesterolemia. (Tr. 464).

On October 28, 2010, Robinson was seen at the Phelps Count Regional Medical Center for severe problems with urinary bladder dysfunction. (Tr. 358-59).

On November 10, 2010, Robinson was seen at the University Hospital because her Foley catheter was malfunctioning. (Tr. 315). Dr. Cummings was unable to insert a speculum due to pain. Robinson had vulvovaginal candidiasis and the vulvovaginal area was extremely tender to touch. (Tr. 317). Dr. Cummings decided to keep the catheter in place. (Tr. 317). Robinson was

7

diagnosed with urinary retention persistent since July 2010, neurogenic bladder with unknown etiology, and vulvovaginal candidiasis. (Tr. 318).

On April 14, 2011, Robinson was seen by Dr. Salim Shackour for worsening neuropathy, dizziness, and pain in the neck and shoulders. (Tr. 338). She rated the pain in her legs as a "5" out of "10." (Tr. 338). The examination revealed 1+ bilateral leg and ankle peripheral edema. (Tr. 341). Dr. Shackour diagnosed Robinson with uncontrolled type 2 diabetes mellitus associated with diabetic neuropathy; hyperlipidemia; hypertension; fatigue; and dizziness. (Tr. 342).

On April 27, 2011, Robinson was seen at the emergency room at the Phelps County Regional Medical Center. (Tr. 365). Robinson reported discoloration of her left great toe and the adjacent toes, as well as her right foot. (Tr. 365). Robinson reported that her diabetes was "relatively well controlled [at] this point." (Tr. 365). The attending physician diagnosed "non-specific bruising." (Tr. 369).

On May 2, 2011, Robinson again was seen at the emergency room at the Phelps County Regional Medical Center. (Tr. 374). She complained of discolorated toenails, loss of sensation in her feet up to her ankles, and dull, aching pain in her foot and ankle. (Tr. 374). Robinson admitted that she has not been wearing her diabetic shoes and has been "out and about several times in the [other] shoes and walking on her feet quite a bit." (Tr. 374). The physician diagnosed subungal ecchymosis, determined that there was no sign of infection, and ordered Robinson to continue taking antibiotics and wearing her diabetic shoes. (Tr. 377).

On May 9, 2011, Robinson was seen at the Anderson Foot Clinic for a check up on her diabetes. (Tr. 332). Robinson indicated that her blood sugars were doing much better in the last several months. (Tr. 332). She complained of black and blue toes and 2 days of shooting, sharp

8

pain and numbness in her feet. (Tr. 332). Robinson was again instructed to stop wearing "Crox" shoes and return to using her diabetic shoes. (Tr. 333).

On June 2, 2011, Robinson saw Dr. Shackour for head and neck pain, dizziness and light-headedness. (Tr. 344). Dr. Shackour diagnosed Robinson with dizziness, hyperlipidemia, uncontrolled type 2 diabetes, diabetic neuropathy leading to bilateral leg pain, candida vaginitis, and anxiety disorder. (Tr. 348).

On July 26, 2011, a carotid duplex study revealed that Robinson had a heterogenous hard plaque consistent with stenosis. (Tr. 380-81). On July 18, 2015, Robinson was seen by Dr. John Paulson to follow up on her chronic diabetes. (Tr. 393).

On August 2, 2011, Robinson was seen at the Rolla Neurology Pain and Sleep Center by Dr. Choudhary. (Tr. 387-90). A nerve conduction study revealed abnormal findings consistent with advanced sensorimotor polyneuropathy in lower extremities and moderate sensorimotor polyneuropathy in right upper extremities which is axonal in nature. (Tr. 390). Dr. Choudhary believed this result was caused by her long-term diabetes and recommended clinical follow up. (Tr. 390).

On August 25, 2011, Dr. Paulson again saw Robinson for a follow up regarding her chronic diabetes. (Tr. 399). Dr. Paulson diagnosed diabetes, hyperlipidemia, and depression. (Tr. 401-02). Dr. Paulson advised her to utilize a diabetic diet and to get her yearly eye and foot examinations. (Tr. 401). On August 31, 2011, Robinson returned to Dr. Paulson because her panic attacks were worse and she was not sleeping well. (Tr. 403). Dr. Paulson diagnosed her with an anxiety disorder, posttraumatic stress disorder, insomnia, and panic attacks. (Tr. 403-05). Dr. Paulson recommended a psychiatric evaluation for Robinson. (Tr. 405).

9

On October 14, 2011, non-examining consultant, Dr. Ruth Stoecker, completed a Physical Residual Functional Capacity Assessment. (Tr. 409-15). Dr. Stoecker believed that Robinson could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull was limited in her lower extremities; climb ramps/stairs/ladders/rope scaffolds frequently; stoop, kneel, crouch, crawl frequently; never balance; and had no manipulative or visual limitations.

On October 17, 2011, non-examining consultant, Dr. Mark Altomari, performed a Psychiatric Review Technique on Robinson. (Tr. 416-26). He opined that Robinson suffered from an anxiety disorder, but that there was insufficient evidence to support the alleged severity of her condition prior to the last insured date of June 30, 2011. (Tr. 426).

On January 9, 2012, Dr. Paulson wrote Robinson a letter, informing her that her tests were abnormal. (Tr. 491). Specifically, she had elevated triglycerides and blood sugars and a low hemoglobin "blood count." On January 12, 2012, Robinson came in for a diabetic checkup and to discuss her laboratory results. (Tr. 492-95). Dr. Paulson noted that Robinson had not been strictly following her diabetic diet. Dr. Paulson diagnosed her with type 2 diabetes, hyperlipidemia, and candidiasis of the mouth. (Tr. 495). She was instructed to get her yearly eye and foot exams.

On April 9, 2012, Robinson appeared for a psychological evaluation by Thomas J. Spencer, Psy.D. (Tr. 581-83). Robinson reported having panic attacks. She also stated that she loves people and being out in public. Dr. Spencer opined that Robinson has a mental illness which interferes with her ability to engage in employment suitable for her age, training,

experience, and/or education and that the duration of this illness could exceed 12 months, but that her prognosis would likely improve with appropriate treatment. (Tr. 583).

On May 14, 2012, Robinson was seen at the Mercy Clinic. (Tr. 454-55). Karen L. Biermann, F.N.P., diagnosed Robinson with depression, uncontrolled type 2 diabetes, hypercholesterolemia, cellulitis, and blister of the groin with an infection. (Tr. 455).

On Jun 13, 2012, Robinson was seen at the Mercy Clinic for follow up for her diabetes. (Tr. 450-52). It was noted that Robinson was asymptomatic, compliant with diabetic medication but not compliant with diabetic diet. (Tr. 451). Robinson was diagnosed with poorly controlled diabetes mellitus. (Tr. 452).

On July 4, 2012, Robinson went to the Phelps County Regional Medical Center for lightheadedness. (Tr. 544-49). Dr. Judge diagnosed her with hypotension and neuropathy. (Tr. 549).

On August 7, 2012, Robinson was seen at the Rolla Neurology Pain and Sleep Center, complaining of neck pain having numbness and tingling in her hands and arms, which is increasingly progressive. (Tr. 586-88). Robinson's electrophysiological study revealed abnormal findings consistent with sensorimotor polyneuropathy in upper extremities which was axonal and moderate in nature. (Tr. 588). Robinson was directed to follow up in clinic.

On August 9, 2012, Robinson reported to Mercy Clinic for a hospital follow up from when she went to the ER on July 4, 2012. (Tr. 447). Robinson reported that on July 4, 2012, she had a severe panic attack at a carnival and EMTs were called. (Tr. 447). She claims that she was admitted to the hospital for a week and she has an upcoming appointment with a psychiatrist. (Tr. 447). Karen L. Biermann, F.N.P., diagnosed Robinson with panic attacks, type two diabetes, diabetic neuropathy, depression, and hypercholesteremic. (Tr. 448).

11

On September 26, 2012, Robinson went to Mercy Clinic for a follow up visit regarding her diabetes. (Tr. 442-444). Robinson indicated that she was compliant with her diabetes medication all of the time and compliant with her diabetes diet most of the time. (Tr. 443). She was diagnosed with hypertension, uncontrolled diabetes mellitus type 2, depression, insomnia, and low HDL. (Tr. 444).

On October 18, 2012, Robinson underwent an ophthalmology examination that showed proliferative diabetic retinopathy—insulin dependent—minimal in OD and clinically significant diabetic macular edema OS—resolved following grid laser treatment. (Tr. 614). Robinson was directed to return in six months for follow up.

On October 29, 2012, Robinson was seen at Phelps County Regional Medical Center for pressure in her chest, exhaustion, and anxiety. (Tr. 512-17). Robinson was diagnosed with somnolence, malaise and chest paint. (Tr. 518). Dr. McCarthy suggested that all of these symptoms were related to Robinson's anxiety and depression. (Tr. 518).

On October 31, 2012, Robinson went to Mercy Clinic related to her symptoms and diagnosis of sensory impairment in her legs andneuropathy. (Tr. 427-34). Dr. Thorat noted Robinson had sensory loss in both feet, more prominent in the distal feet, and mild unstable gait. (Tr. 432). Dr. Thorat diagnosed her with type 2 diabetes mellitus with diabetic neuropathy, vitamin B12 deficiency, sleep apnea, and obesity. (Tr. 433). Dr. Thorat offered Robinson advice on "diet and exercise to control her diabetes and diabetic neuropathy, [but Robinson] declined and suggested she would like to manage on her own." (Tr. 433). Dr. Thorat stated that Robinson's neuropathy symptoms were currently stable and did not need any change. (Tr. 433).

On December 10, 2012, Robinson was seen by Dr. Paulson at TCMH Family Clinic in Licking for Robinson's anxiety disorder, PTSD, insomnia, and acute panic attacks. (Tr. 470-71).

On December 13, 2012, Dr. Anderson filed out a medical source statement regarding Robinson's foot problems. (Tr. 612). Dr. Anderson stated that Robinson should be limited to standing 30 minutes at a time and would need to elevate legs occasionally during an 8 hour work day. Dr. Anderson stated that Robinson's pain was severe but noted that Robinson had not showed up for her last three scheduled visits on July 15, 2011, July 13, 211 and August 2, 2012.

On December 19, 2012, Robinson was seen at Mercy Clinic for follow up regarding her diabetes. (Tr. 625-28). Robinson reported she was compliant with her diabetic medication all of the time and compliant with her diabetic diet some of the time, stating that she had not been following her diet as strictly as she should. (Tr. 625). She reported stress at home because her teenage son had begun "popping pills" and running with a rough crowd. She reported severe pain in her legs and numbness in her feet. Dr. Hern ordered Robinson a disability placard. (Tr. 628).

## IV.    Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be

13

terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[1] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R.

---

[1] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

14

§ 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

15

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. Discussion

Robinson claims that the ALJ did not derive a proper RFC because the stand and/or walk limitation is not supported by substantial evidence. (ECF No. 12 at 10-12). Robinson asserts that the ALJ improperly relied on non-examining physician Dr. Stoecker's opinion that Robinson could stand and/or walk for six hours in an eight-hour day. (ECF No. 12 at 10). The ALJ stated that he afforded this opinion "partial weight" to the extent that it was consistent with the RFC. (Tr. 23). Robinson argues that her doctors limited her ability to stand and/or walk. (ECF No. 12 at 11). She claims that her treating podiatrist, Dr. Anderson, opined that she could stand no more than 30 minutes at a time. (ECF No. 12 at 11 (citing Tr. 612)). She also notes that her primary care physician, Dr. Hern, issued her a handicap placard. (ECF No. 12 at 11 (citing 628)). She further argues that her ability to stand is affected by her diabetic neuropathy, which has already caused her to have two toes amputated and causes her to have continued treatment. (ECF No. 12 at 11). In response to the ALJ's finding that Robinson was noncompliant and would be capable of light work if compliant with a diabetic diet and treatment, Robinson argues that her symptoms due to diabetes did not improve even with compliance. (ECF No. 12 at 11-12). Rather, she continued to have uncontrolled diabetes and continued abnormalities including edema and sensory deficits. (ECF No. 12 at 12 (citing Tr. 332, 338, 377, 347-48, 432, 452, 461, 494, 500, 593)). Robinson argues that the ALJ's reliance on Dr. Stoecker's opinion was improper because

16

he did not have the ability to review the subsequent records that showed Robinson's worsening symptoms. (ECF No. 12 at 12).

Robinson also contends that the ALJ failed to properly consider Robinson's statements. (ECF No. 12 at 12-16). The ALJ discounted Robinson's testimony because she received unemployment benefits, she was non-compliant with treatment recommendations, and because her complaints were not supported by the "clinical and objective findings in the record." (ECF No. 12 at 12 (citing Tr. 19-20)). Robinson argues that the ALJ's finding that she was noncompliant was in error because the ALJ did not consider Robinson's reasons for her noncompliance. (ECF No. 12 at 13). Specifically, Robinson contends that the ALJ must consider if Robinson's failure to follow treatment was a result of her mental impairment before noncompliance can be used to discount her testimony. (ECF No. 12 at 13 (citing *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009)). Robinson argues that the ALJ did not consider whether her panic attacks and depression interfered with her compliance with treatment. (ECF No. 12 at 13-14). Further, Robinson maintains that she was largely compliant with her diabetic treatment but it failed to improve her condition. (ECF No. 12 at 14). Robinson claims that there is nothing in the record that indicates that she will be able to perform light work, even if she followed the recommended treatment for diabetes. (ECF No. 12 at 15).

The Court, however, finds that the ALJ properly discounted Robinson's testimony because she was not credible and properly accounted for Robinson's restrictions in formulating Robinson's RFC. "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).

The ALJ considered several factors to evaluate Robinson's credibility. First, evidence in the record indicates that Robinson was noncompliant with treatment for her diabetes. (Tr. 20).

17

*See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (citing *Gowell v. Apfel,* 242 F.3d 793, 797 (8th Cir. 2001) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility."). In December 2012, Robinson told Dr. Hern that she was not following a diabetic diet as prescribed. (Tr. 21, 625). Robinson saw a podiatrist in May 2011 but failed to show up for three subsequent appointments. (Tr. 332-33, 612). In addition, the podiatrist noted that Robinson's foot problems were the result of her wearing foam shoes, or Crocs, instead of her prescribed diabetic shoes. (Tr. 21, 612). Based upon this evidence, the ALJ reasonably determined that Robinson's complaints were less credible. Further, the Court does not need to address whether Robinson's noncompliance was the result of her alleged mental illness, as suggested by Robinson. Nothing in the record suggests that Robinson's failure to comply with her prescribed treatment was caused by her mental illness. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (distinguishing *Pate-Fires* because in this case there was "little or no evidence expressly linking Wildman's mental limitations to such repeated noncompliance" with her prescribed diet).

The ALJ also cited to evidence that when Robinson complied with treatment then it worked to improve her diabetic situation. (Tr. 20-21). For example, an examination in August 2011 showed that Robinson had decreased sensation in her arms and legs and a slightly decreased grip strength, but otherwise had full muscle strength and normal muscle tone. (Tr. 20-21, 387-91, 408). In May and June 2010, Robinson reported being compliant with diabetes medications and was asymptomatic except for neuropathy in her arms and legs for which she saw a specialist. (Tr. 20, 450-58). In October 2012, Dr. Thorat noted that Robinson's neuropathic symptoms were stable and did not require any changes in treatment. (Tr. 22, 427-34). The ALJ acknowledged that Robinson continued to report pain and numbness even when

she complied with treatment. However, such a finding is not determinative of whether she was under a disability. Rather, the ALJ properly considered the degree to which Robinson's treatment worked in order to reduce her neuropathic symptoms to where she was able to perform substantial gainful activity. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) ("As is often true in disability cases, the question was not whether Hogan was experiencing pain, but rather the severity of her pain.").

The ALJ also properly considered that Robinson received unemployment benefits for more than a year-and-a-half after her alleged onset of disability. (Tr. 44-45, 127). "Complaints that are inconsistent with the evidence as a whole, including medical reports and daily activities, may be discredited by the ALJ." *Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996) (citing *Haynes v. Shalala,* 26 F.3d 812, 814–15 (8th Cir.1994)). Applying for unemployment benefits adversely affects credibility, although it is not conclusive, because an unemployment applicant "must hold himself out as available, willing and able to work." *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (citing *Jernigan v. Sullivan,* 948 F.2d 1070, 1074 (8th Cir.1991)). While receiving unemployment benefits from March 2010 through November 2011, Robinson applied for jobs as a cashier, server, and a nurse's aide, which would have required her to work while standing. (Tr. 19, 45-46). Because Robinson applied for jobs for which she now claims she would have been unable to perform, the Court agrees the that ALJ reasonably found her disabling complaints less credible. *See Melton v. Apfel*, 181 F.3d 939, 942 (8th Cir. 1999) (claimant's "job search undermines his claim that he was unable to work").

Based upon the above analysis, the Court finds that the ALJ properly performed a credibility analysis regarding Robinson's complaints and that the ALJ's determination that Robinson was not disabled is supported by substantial evidence in the record.

19

The Court also finds that the ALJ properly considered the opinion evidence in the record in determining Robinson's RFC. The ALJ evaluated the medical evidence, Robinson's activities of daily living and the supporting medical evaluations to evaluate Robinson's credibility and determine her RFC. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)(citing *Reynolds v. Chater,* 82 F.3d 254, 258 (8th Cir. 1996)("Although specific articulation of credibility findings is preferable, [the Court] consider[s] the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record.").

First, the ALJ considered Robinson's primary physician, Dr. Hern's medical records. Robinson places great emphasis on Dr. Hern's approval of a disabled parking placard. (Tr. 628). The ALJ considered the evidence that Dr. Hern approved a disabled parking placard, but gave it limited weight. (Tr. 22). The ALJ noted that Dr. Hern provided "no explanation ... regarding why the handicapped placard had been authorized." (Tr. 22, 628). The ALJ also found that Dr. Hern's approval of a disabled parking placard was "inconsistent with the findings at the October 2012 consultation with neurologist Dr. Thorat, who noted that [Robinson's] A1C had dropped to 8.5 with better compliance" and that "her neuropathic symptoms were stable and that when he had offered advice regarding diet and exercise to reduce pain and increase functioning, [but Robinson] had declined." (Tr. 22). The Court finds that the ALJ properly gave little weight to Dr. Hern's decision to give Robinson a disabled parking placard because of the lack of an explanation in the record for the recommendation and because it conflicted with the contemporaneous opinion of Dr. Thorat. *See* 20 C.F.R. §404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

20

The Court notes that the ALJ also considered a medical source statement provided by podiatrist Sharon Anderson in December 2012. (Tr. 22-23, 612). Dr. Anderson indicated that Robinson had limitations due to her diabetic neuropathy and would be able to stand only 30 minutes at a time and would need to elevate her legs. (Tr. 612). The ALJ gave Dr. Anderson's opinion only partial weight because Dr. Anderson saw Robinson only once—in May 2011—and Robinson had been a "no show" for the following 3 appointments, which demonstrated to the ALJ that Robinson did not believe that her neuropathy was as severe as Dr. Anderson had stated in the medical source statement. (Tr. 23; *See Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (ALJ properly considered claimant's relative lack of medical care as relevant when considering claimant's allegations of unbearable pain). The ALJ gave Dr. Anderson's opinion partial weight, particularly with respect to her opinion that, although Robinson might not have her sensation restored to normal, her neuropathy could be expected to improve with treatment. (Tr. 23, 612). The Court finds that the ALJ properly only gave Dr. Anderson's opinion partial weight based upon the limited extent of her relationship with Robinson. Because Dr. Anderson had only seen Robinson once, her opinion was reasonably afforded less weight. (Tr. 23; *see* 20 C.F.R. §404.1527(c)(2)(i)("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The Court also agrees with the ALJ's determination that Dr. Anderson's statements regarding Robinson's limitations were contradicted by Robinson's own statements that she could stand for 1 to two hours at a time and then stand for another hour after a 30-minute break. *See Whitman*, 762 F.3d at 706 (ALJ reasonably stated he discounted physician's opinion because the opinion was "more restrictive than self-reported activities"). Finally, the Court believes that the ALJ correctly found that Dr. Anderson's opinion was inconsistent with the

medical record, including Dr. Anderson's own notes. (Tr. 23). Dr. Anderson acknowledged that Robinson's neuropathy could be expected to respond to treatment. (Tr. 23, 612). In fact, the ALJ found that Robinson's neuropathic symptoms could be controlled with treatment. *See* Tr. 20, 23, 427-34, 450-58. Thus, the medical record supports a finding that Robinson's neuropathic symptoms could be and were controllable with treatment. The Court finds no error in the ALJ's consideration of Dr. Anderson's opinion and decision to afford it partial weight.

The ALJ also afforded partial weight to the opinion of state agency medical consultant Ruth Stoecker, M.D. (Tr. 23, 409-15). Dr. Stoecker reviewed the record and concluded that Robinson could perform the exertional requirements of medium work, with some limitations. (Tr. 23, 410). In affording Dr. Stoecker's opinion some weight, the ALJ noted that Dr. Stoecker was familiar with agency definitions and evidentiary standards and that her opinion was generally consistent with the medical evidence that suggested that Robinson's symptoms could be controlled when she complied with treatment. (Tr. 20, 23, 427-34, 450-58). In addition, ALJ included more limitations in the RFC, beyond those contained in Dr. Stoecker's opinion. The ALJ limited Robinson to only light (not medium) exertional work and to only occasional (not frequent) balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. (Tr. 18, 411). Thus, Robinson is incorrect when she claims that the ALJ deferred only to the opinion of Dr. Stoecker. Likewise, Robinson's argument that the ALJ improperly relied on Dr. Stoecker's opinion of October 2011 and did not consider evidence subsequent treatment notes fails because the ALJ clearly did not rely solely on Dr. Stoecker's opinion. Nevertheless, the ALJ was permitted to consider the opinion of Dr. Stoecker, in addition the rest of the evidence in the record. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the

22

consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.").

The Court finds that the ALJ appropriately fashioned the RFC to Robinson's limitations based upon the whole record. *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."). The ALJ sufficiently summarized the evidence, including Robinson's testimony, her treatment history, and the medical opinions, that allowed him to make an informed decision regarding Robinson's ability to perform a range of light work. In sum, the Court finds that the ALJ properly evaluated and considered the evidence in determining Robinson's credibility and RFC and that the ALJ's decision is supported by the evidence.

**VI.    Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 5th day of August, 2015.

Bonnie L. White

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE

23